**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Verdean Roloff, | ) | |
| | ) | |
|  Plaintiff and Counter-Defendant, | ) | **ORDER GRANTING DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| Continental Resources, Inc. and Reid | ) | |
| Energy Investments, LLC | ) | |
| | ) | Case No. 4:13-cv-144 |
|  Defendants and Counter-Claimants. | ) | |

Before the Court is a Motion for Summary Judgment filed by Defendants Continental Resources, Inc. ("Continental") and Reid Energy Investments, LLC ("Reid Energy") on September 12, 2014. See Docket No. 21. The Plaintiff, Verdean Roloff, filed a response opposing the motion on October 17, 2014. See Docket No. 31. The Defendants filed a reply brief on November 3, 2014. See Docket No. 34. For the reasons set forth below, the motion is granted.

## I. BACKGROUND

The Plaintiff owns an interest in the oil and gas in and under the following lands located in Williams County, North Dakota:

> Township 159 North, Range 95 West
> Section 23: SE/4NE/4, NE/4SE/4
> Section 24: NW/4NE/4, W/2, S/2SE/4
> Section 25: NW/4

See Docket No. 32, ¶ 2. On November 14, 2003, Roloff leased his mineral rights in this property to Joliette Oil (USA), Inc. The lease grants to the lessee the "exclusive right for the purpose of mining, exploring by geophysical and other methods, and operating for and producing therefrom oil and all gas." Docket No. 32–1. The lease has been assigned numerous times, although it is

1

currently owned by Continental and Reid Energy. See Docket No. 32, ¶ 4. Continental is responsible for conducting the oil and gas exploration and performing all production operations on the property, while Reid Energy is the non-operating working interest owner of the lease.

The lease contains a Pugh clause[1] which states:

> Notwithstanding the provisions of this lease to the contrary, this lease shall terminate at the end of the primary term as to all of the leased lands except those within a producing or spacing unit prescribed by law or administrative authority on which is located a well producing or capable of producing oil and/or gas or on which lessee is engaged in drilling or reworking operations. However, this lease shall not terminate as to any of the leased lands so long as drilling or reworking operations are being continuously prosecuted, that is, if not more than one (1) year shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of another well.

Docket No. 32–1.

The lease also contains a habendum clause,[2] which provides:

> 1. It is agreed that this lease shall remain in force for a term of Five (5) years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling or re-working operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; and operations shall be considered to be continuously prosecuted if not more than ninety (90) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If after discovery of oil or gas on said land or on acreage pooled therewith, the production thereof should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or re-working operations within ninety (90) days from date of cessation of production or from date of completion of dry hole. If oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas is produced from the leased premises or an acreage pooled therewith.

---

[1] The North Dakota Supreme Court has explained, "A Pugh clause is 'a type of pooling clause which provides that drilling operations on or production from a pooled unit or units shall maintain the lease in force only as to lands included within such unit or units.'" Egeland v. Cont'l Res., Inc., 2000 ND 169, ¶ 4 n.4, 616 N.W.2d 861 (citing 8 P. Martin & B. Kramer, Williams & Meyers Oil and Gas Law Manual of Terms, p. 879 (1999); Olson v. Schwartz, 345 N.W.2d 33, 41 n.3 (N.D. 1984) (Schneider, D.J., specially concurring)).

[2] The North Dakota Supreme Court has explained, "A habendum clause sets forth 'the duration of the grantee's or lessee's interest in the premises.'" Egeland, 2000 ND 169, ¶ 3 n.1 (citing 8 P. Martin & B. Kramer, Williams & Meyers Oil and Gas Law Manual of Terms, p. 479 (1999); Olson, 345 N.W.2d at 36).

Docket No. 32–1.

The lease's primary term of five years ended on November 14, 2008. The parties dispute whether the lease remained in effect after that date. At the end of the primary term, the Defendants admit that no oil or gas was being produced from the property. However, the Defendants contend that Continental was engaged in drilling operations at the end of the primary term which Continental continuously pursued.

The Defendants assert several facts which they claim demonstrate Continental's engagement in drilling operations. First, Continental took a series of steps to prepare for drilling, beginning several weeks before the end of the primary term. On August 21, 2008, Continental obtained a spacing order from the North Dakota Industrial Commission for the first well it planned to drill—the Lawrence 1–24H Well. See Docket No. 24–2. On October 1, 2008, Continental's contractor, Brosz Engineering, Inc. staked and surveyed the well pad, bottom hole location, and access road for the Lawrence 1–24 H Well. See Docket No. 24–4. On October 21, 2008, the Standard Planning Report was completed for the well. See Docket No. 24–5. The North Dakota Industrial Commission approved the drilling permit for the Lawrence 1–24H Well on October 24, 2008. See Docket No. 24–7.

The Defendants also submitted an affidavit of Chad Newby, the Operations Land Supervisor for Continental. See Docket No. 23. According to Newby, on November 4, 2008, Hexom Earth Construction began building the reserve pit, well site location, and the access road for the Lawrence 1–24H Well. See Docket No. 23, ¶ 2. Between November 11, 2008 and November 19, 2008, "Hexom Earth Construction hauled and furnished crushed gravel, leveled scoria and moved additional equipment to the Lawrence Well site [while] Continental simultaneously moved casing for the Lawrence Well to the well site." Id. at ¶ 3. Further, sometime

3

before November 14, 2008, "Continental lined the reserve pit and completed the access road to the Lawrence Well." Id. at ¶ 4. On November 14, 2008, the North Dakota Industrial Commission produced a reserve pit diagram which depicted the access road. See Docket No. 24–8.

After the primary term ended, Continental took further steps to drill the well. On November 17 and 18, 2008, contractors "hauled tanks, pit liners, . . . separators, treaters, and pumping units to the well site." See Docket No. 23, ¶ 6. Further, on November 19, 2008, the drilling rig and drill bits were delivered to the well site, "casings were unloaded, and Continental drilled rat and mouse holes at the Lawrence Well" site. Id. at ¶ 7. Then, on November 23, 2008, Continental set the conductor pipe. See id. at ¶ 8.

Continental spud the well on November 24, 2008, and continuously drilled it until December 29, 2008. See Docket Nos. 24–9 and 24–10. Finally, the Lawrence 1–24H Well was completed and began producing oil and gas on February 7, 2009, and the well has continued to produce oil and gas ever since. See Docket No. 24–9.

Roloff does not dispute many of the facts alleged by Continental. However, Roloff does dispute some of the allegations made in Newby's affidavit regarding the preparation of the well site. See Docket No. 32, ¶ 7. Specifically, Roloff disagrees that the casing for the well was hauled to the site between November 11 and November 19, 2008. Id. at ¶ 8. Roloff alleges that he was the owner of Roloff Testing and Transfer, Inc., the company that Continental hired to move the casing to the well site, and the casing was delivered on November 17, 2008, but was unusable. Id. at ¶¶ 9–11. Roloff also disputes Newby's assertion that Continental completed an access road on November 14, 2008. Rather, Roloff contends that the access road was "an existing approach to a farmer's field that was graveled." Id. at ¶ 16. Roloff further alleges that on November 17, 2008, when he visited the well site, he "witnessed no other casing or equipment on site," other than the

4

unusable casing his company delivered that day. Id. at ¶ 13. Finally, Roloff claims that, prior to the expiration of the primary term, "there was only minimal dirt work completed on the property." Id. at ¶ 19.

On October 18, 2013, Roloff filed a complaint against the Defendants in state court in Williams County, North Dakota. See Docket No. 1–1. On November 20, 2013, the Defendants removed the action to federal district court, based on the parties' diversity of citizenship, and filed an answer and counterclaim. See Docket Nos. 1 and 10. Roloff claims the Defendants breached their contract and committed trespass because the lease expired on November 14, 2008, and the Defendants spud and drilled the well after the end of the primary term. The Defendants contend the leases did not expire because Continental was engaged in drilling operations on the property prior to the expiration of the primary term of the lease. In the alternative, if the lease did expire at the end of the primary term, the Defendants argue that Roloff's trespass claim still fails as a matter of law because the spacing units at issue were force-pooled by the North Dakota Industrial Commission. Roloff and the Defendants each seek to quiet title as to the interests in the lease. Roloff further seeks an order enjoining Continental from further drilling on the property.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1). The court must consider the substantive standard of proof when ruling on a motion for summary judgment. Anderson, 477 U.S. at 252.

### III.  LEGAL DISCUSSION

The parties dispute whether Continental's actions were sufficient to constitute drilling operations at the end of the primary term. This Court has previously considered the meaning of the term "drilling operations" with regard to oil and gas leases and has explained, "Drilling operations commence when (1) work is done preparatory to drilling, (2) the driller has the capability to do the actual drilling, and (3) there is a good faith intent to complete the well. It is not necessary that the drill bit actually penetrate the ground." Anderson v. Hess Corp., 733 F.Supp.2d 1100, 1107 (D.N.D. 2010) (quoting Murphy v. Amoco Prod. Co., 590 F.Supp. 455, 458 (D.N.D. 1984)). "'The key element' in determining what constitutes drilling operations 'is

whether the operation is associated or connected with the physical site of the well or unit.'" Id. at 1107–08 (quoting Sheffield v. Exxon Corp., 424 So.2d 1297, 1302 (Ala. 1982)).

In Anderson, this Court held that a company that "surveyed and staked a well, obtained a permit to drill from the Oil and Gas Division of the North Dakota Industrial Commission, leveled and lazered the pad, dug the drilling pit and lined it with gravel and clay, widened the access road to the well, drilled the rat hole for the main conductor pipe, moved equipment to the location, and drilled the mouse hole" before the primary term of the lease expired had engaged in drilling operations. Anderson, 733 F.Supp.2d at 1108. In addition, this Court held that the company's capability to complete the drilling and its good faith intent were evidenced by the fact the company completed the well just under two months after the primary term ended and the well continuously produced oil and gas since that time. Id.

In reaching its decision in Anderson, the Court relied on Professor W.L Summers' treatise on oil and gas law, which explains the general rule related to drilling operations as follows:

> The general rule seems to be that actual drilling in unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease. If the lessee has performed such preliminary acts within the time limited, and has thereafter actually proceeded with the drilling to completion of a well, the intent with which he did the preliminary acts are unquestionable, and the court may rule as a matter of law that the well was commenced within the time specified by the lease.

Id. (quoting 2 W.L. Summers, *Oil and Gas* § 349 (1959)). This Court has recently decided two other cases with similar facts and concluded the lessee had performed sufficient preparatory work to constitute drilling operations. See Renbarger v. Zavanna, LLC, 2014 WL 29505 (D.N.D. Jan. 3, 2014) (obtaining necessary permits and regulatory approval for drilling, moving equipment to the well, removing snow, ripping the surface, and beginning work on a road); Wold v. Zavanna,

7

LLC, 2013 WL 6858827 (D.N.D. Dec. 31, 2013) (obtaining necessary permits and regulatory approval for drilling, staking and surveying the well site, moving equipment to the well site, spreading scoria, and digging a reserve pit).

In this case, it is undisputed that in advance of the expiration of the primary term on November 14, 2008, Continental obtained the necessary permits and regulatory approval for drilling; staked and surveyed the well pad, bottom hole location, and access road; completed a Standard Planning Report for the well; began building the reserve pit, well site location, and at a minimum laid gravel on the access road; and hauled crushed gravel and leveled scoria to the well site. Roloff essentially only disputes Continental's assertion that it built an access road and moved casing and other equipment to the well site before the end of the primary term.

The Court concludes that Continental's preparatory work was sufficient to constitute drilling operations. First, Roloff's disagreement over whether Continental actually constructed a new access road is immaterial as a matter of law. This Court concluded that an oil company that merely widened an access road, as in Anderson, and one that merely "worked on" an access road, as in Wold, still had done enough preparatory work to have engaged in drilling operations. As this Court has previously stated, the "key element" is whether the work "is associated or connected with the physical site of the well or unit." Anderson, 733 F.Supp.2d at 1107–08 (internal quotation marks and citation omitted). Laying gravel on a road that would be used to access the well site is work that is connected with the physical site. When combined with Continental's other undisputed physical work at the well site, laying gravel on an access road is evidence that Continental was engaged in drilling operations prior to the expiration of the primary lease term.

Further, the Court concludes that even if Continental did not haul usable casing or other equipment to the well site prior to the expiration of the primary term, it was engaged in drilling

8

operations. Although hauling drilling equipment to a well site is certainly a preparatory act of drilling, it is not necessarily a prerequisite to a finding that an oil company was engaged in drilling operations. Continental was engaged in a wide variety of other preparatory work at the well site location, such as surveying and staking the well, building a reserve pit and the well site location, laying gravel on the access road, and hauling gravel and scoria to the well site. These other acts of physical preparation at the well site are sufficient to constitute drilling operations under the circumstances of this case. In addition to the recent cases decided by this Court, courts in other jurisdictions have held activities similar to those conducted in this case constitute drilling operations. See, e.g., Cason v. Chesapeake Operating, Inc., 92 So.3d 436 (La. Ct. App. 2012) (holding that merely surveying the well site, staking the well site and access road, and clearing trees at the well site prior to the expiration of the primary term was sufficient to constitute drilling operations, while noting that merely obtaining a drilling permit would be insufficient); Johnson v. Yates Petroleum Corp., 981 P.2d 288 (N.M. Ct. App. 1999) (holding that merely staking and surveying the well site, obtaining a drilling permit, clearing brush, and leveling the well site location prior to the expiration of the primary term was sufficient to constitute drilling operations).

Continental also demonstrated that it had the capability and good faith intent to complete the well. Continental delivered the drilling rig to the well site within days of the primary term's expiration and began drilling the well only ten days after the primary term expired. Less than three months after November 14, 2008, the well began producing, and oil and gas and has been continuously produced since that time. Continental's capability to drill and their good faith intent to complete the well, combined with its undisputed preparatory work at the well site, are sufficient for the Court to conclude as a matter of law that Continental engaged in drilling operations which extended the lease beyond the primary term.

9

Because the Court concludes the lease did not expire at the end of the primary term, the Court need not address whether Roloff's trespass claim fails as a result of the North Dakota Industrial Commission's pooling of the spacing units at issue.

IV. **CONCLUSION**

For the reasons set forth above, the Defendants' motion for summary judgment (Docket No. 21) is **GRANTED**.

**IT IS SO ORDERED**

Dated this 8th day of January, 2015.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court